# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Clobetasol Antitrust Litigation | Case No. 16-mc-7229 (WHP) |
| This Document Relates To: All Direct Purchaser Actions | |

**CONSOLIDATED AMENDED DIRECT PURCHASER CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ............................................................................................. 1

II.  PARTIES .................................................................................................... 17

    A.   Agents and Co-Conspirators ................................................................. 20

III. JURISDICTION AND VENUE ..................................................................... 20

IV.  INTERSTATE TRADE AND COMMERCE ................................................. 21

V.   FACTUAL ALLEGATIONS ......................................................................... 22

    A.   Overview of the Generic Drug Market ................................................. 22

    B.   The DOJ and 20 States' Attorneys General Are Investigating
        How Generic Drug Companies Utilied Trade Associations to Reach Illegal
        Agreements ........................................................................................... 22

    C.   Clobetasol Prices Soar ......................................................................... 32

    D.   Congressional, State Attorneys General,  and Regulators' Responses to Rising
        Generic Drug Prices ............................................................................. 35

VI.  THE CLOBETASOL MARKET IS HIGHLY SUSCEPTIBLE TO
     COLLUSION ................................................................................................ 38

VII. THE DEFENDANTS ACTED AGAINST THEIR UNILATERAL
     SELF-INTEREST ABSENT A CARTEL ..................................................... 43

VIII. CLASS ACTION ALLEGATIONS .............................................................. 43

IX.  ANTITRUST INJURY ................................................................................. 45

X.   VIOLATION OF THE SHERMAN ACT § 1 ................................................ 46

DEMAND FOR RELIEF ...................................................................................... 47

DEMAND FOR JURY TRIAL .............................................................................. 48

Plaintiffs FWK Holdings, L.L.C. and César Castillo, Inc. ("Plaintiffs"), both on behalf of themselves and all others similarly situated, against 1) Fougera Pharmaceuticals, Inc. and Sandoz. Inc. (collectively defined below as "Sandoz"); 2) Akorn, Inc., and Hi-Tech Pharmacal Co. Inc. (collectively defined below as "Hi-Tech"); 3) Perrigo New York, Inc.; 4) Taro Pharmaceuticals USA, Inc.; and 5) Wockhardt USA, LLC, and Morton Grove Pharmaceuticals, Inc. (collectively defined below as "Wockhardt") (collectively, the "Defendants") allege:

## I.   INTRODUCTION

1.     This is a civil antitrust action seeking treble damages arising out of the Defendants' unlawful scheme to fix, maintain, and stabilize the prices and allocate customers for generic clobetasol propionate: topical ointment .05%; topical solution .05%; topical gel .05%; topical cream .05%; and emollient .05% (collectively, "Clobetasol") in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

2.     Clobetasol, which has been available on the market since 1994, is a high-potency prescription corticosteroid used in the treatment of various skin disorders including eczema, psoriasis, dermatitis, and vitiligo. It is reportedly one of the most prescribed dermatological drugs in the United States.

3.     As alleged below, Defendants' scheme injured Plaintiffs and the Class of direct purchasers they seek to represent (as defined below), causing them to pay overcharges. Plaintiffs seek to recover these overcharges and seek other relief arising out of Defendants' conspiracy to charge supra-competitive prices for clobetasol during the period from June 2014 to the present ("Class Period").

4.     Beginning in June 2014, contrary to past practice, Defendants, acting in unison, caused the price of clobetasol to dramatically increase.  These dramatic increases were not the result

1

of material changes in costs, supply, or demand.  These price increases were instead the result of an agreement among Defendants to increase pricing and restrain competition, and allocate customers for the sale of clobetasol in the United States. The agreement was furthered by discussions held at the 2014 annual meeting of the National Association of Chain Drug Stores ("NACDS") held on April 26-29, 2014 in Scottsdale, Arizona, and at Generic Pharmaceutical Association ("GPhA") meetings in Orlando, Florida, and North Bethesda, Maryland, in February and June 2014, respectively

5.   Following these meetings, Defendants collectively raised clobetasol prices by a material amount.  The drastic increase of clobetasol prices following the conspiracy was a dramatic, inexplicable change from pricing before the conspiracy:

**A.** **Clobetasol 0.05% emollient cream (15 mg., 30 mg., 60 mg.)**

1.   **Taro**: Before the Class Period, Taro's prices were remarkably stable.  In the five preceding months, the standard deviation for its 15 mg, 30 mg. and 60 mg. sizes of clobetasol 0.05% emollient cream products were no more than 3% of the average prices of its products during the same period.   After this period of relative stability, Taro increased its effective prices, beginning in June 2014.  Between May 2014 and June 2014, for its three dosage formulations, Taro raised its effective prices by 177% to 306%. Taro's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 15 mg dosage from about $0.47 per unit in May 2014 to about $2.48 per unit by June 2015 (an increase of 525%).  It increased the effective price of the 30 mg dosage from about $0.37 per unit in May 2014 to about $2.34 per unit in January 2015 (an increase of 637%).  The effective price of the 60 mg dosage increased from about $0.32 per unit in May 2014 to about $2.31 per unit by

2

November 2015 (an increase of 725%).  Taro increased its WAC[1] benchmark prices on June 3, 2014, 621% to 1,011%,.  The high prices have continued – the high benchmark prices remain in place and effective prices have not returned to the pre-conspiracy, competitive level.  For example, in November 2016, the effective price of Taro's 60 mg. product was approximately $1.80, representing a 564% increase over the price of the same product in May 2014.

        **2.**      **Hi Tech**: Before the Class Period, Hi Tech's prices were remarkably stable.  In the five preceding months, the standard deviation for its 30 mg. and 60 mg. sizes of clobetasol 0.05% emollient cream products were respectively only 11% and 9% of the average prices of its products during that period.  After this period of relative stability, Hi-Tech increased its effective prices, beginning in August 2014.  Between May 2014 and August 2014, for those two dosage formulations, Hi-Tech raised its prices by 752% and 367%.  Hi-Tech's effective prices for these formulations continued to skyrocket during the Class Period.  It increased the effective price of the 30 mg dosage from about $0.26 per unit in May 2014 to about $2.19 per unit by September 2014 (an increase of 856%).  The effective price of the 60mg dosage increased from about $0.20 per unit in May 2014 to about $1.43 per unit by October 2014 (an increase of 705%).  It also began selling its 15 mg. product in August 2014 at the extraordinary effective price of approximately $3.03 per unit.  Hi-Tech increased its WAC benchmark prices on August 9, 2014 by between 673% and 1001%,.  The high prices have continued – the high benchmark prices remain in place and effective prices have not returned to the pre-conspiracy, competitive level.  For example, in

---

[1] WAC is a benchmark price that represents the manufacturer's published catalog or list price for a drug product to wholesalers as publicly reported by the manufacturer. WAC does not represent actual transaction prices and does not include discounts, rebates or reductions in price.  "Effective prices" represent actual transaction prices, as reported by IMS.  However, an increase in the WAC benchmark price results in an increase in effective prices.

November 2016, the effective price of Hi-Tech's 60 mg. product was approximately $1.12, representing a 550% increase over the price of the same product in May 2014.

   **3.**  **Sandoz:** Before the Class Period, Sandoz's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg, 30 mg. and 60 mg. sizes of clobetasol 0.05% emollient cream products were respectively only 7%, 5%, and 11% of the average prices of its products during that period. After this period of relative stability, Sandoz increased its effective prices, beginning August 2014. Between May 2014 and August 2014, for its three dosage formulations, Sandoz raised its effective prices by 391% to 551%. Sandoz's effective prices for these dosage formulations continued to skyrocket during the Class Period. It increased the effective price of the 15 mg dosage from about $0.25 in May 2014 to about $1.94 per unit by November 2014 (an increase of 784%). It increased its 30 mg dosage from about $0.19 per unit in May 2014 to about $1.91 per unit by November 2014 (an increase of 1,019%). The effective price of the 60mg dosage increased from about $0.14 per unit in May 2014 to about $1.92 per unit by November 2014 (an increase of 1,346%). Sandoz's effective prices remain high and have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Sandoz's 60 mg. product was approximately $1.27, representing an 894% increase over the price of the same product in May 2014.

   **4.**  **Fougera:** On July 18, 2014, Fougera raised its WAC benchmark prices for its clobetasol 0.05% emollient cream products from 203% to 356%. These high benchmark prices remain in place and have not returned to the pre-conspiracy levels.[2]

---

[2] Fougera's effective prices are not reported.

**B.**   **Clobetasol Propionate Cream 0.05% (15 gm., 30 gm., 45 gm., 60 gm.).**

     **1.**   **Hi-Tech**: Before the Class Period, Hi-Tech's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg., 30 mg., 45 mg., and 60 mg. dosages of clobetasol propionate cream 0.05% products were only 4% to 19% of the average prices of its products during the same period.   After this period of relative stability, Hi-Tech began increasing its effective prices in June and July 2014.   Between May 2014 and June 2014, Hi-Tech raised its effective prices for the 30 mg. and 45 mg. dosages by 206% and 182%, respectively. In July 2014, Hi Tech raised the effective price of its 15 mg dosage by 829% and its 60 mg. dosage by 1,521%.   Hi-Tech's effective prices for these dosage formulations continued to skyrocket during the Class Period.   It increased the effective price of the 15 mg dosage from about $0.17 in May 2014 to about $2.90 per unit by July 2015 (an increase of 1,719%).   It increased its 30 mg dosage from about $0.11 per unit in May 2014 to about $2.34 per unit by June 2015 (an increase of 2,139%).   It increased the effective price of the 45 mg dosage from about $0.10 per unit in May 2014 to about $2.65 per unit by May 2015 (an increase of 2,627%).   The effective price of the 60mg dosage increased from about $0.09 per unit in May 2014 to about $3.07 per unit by July 2015 (an increase of 3,360%).   Hi-Tech increased its WAC benchmark prices on August 9, 2014 by between 1,732% and 2,138%. The high prices have continued – the high benchmark price remains in place and effective prices have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Hi-Tech's 60 mg. product was approximately $1.93, representing a 2,107% increase over the price of the same product in May 2014.

     **2.**   **Sandoz:** Before the Class Period, Sandoz's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg., 30 mg., 45 mg., and 60 mg. dosages of clobetasol propionate cream 0.05% products were between 5% and 8% of the average

prices of its products during the same period.  After this period of relative stability, Sandoz increased its effective prices, beginning August 2014.  Between May 2014 and August 2014, for its four dosage formulations, Sandoz raised its effective prices by 683% to 1,099%. Sandoz's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 15 mg dosage from about $0.16 in May 2014 to about $3.12 per unit by October 2014 (an increase of 1,996%).  It increased its 30 mg dosage from about $0.13 per unit in May 2014 to about $3.12 per unit by November 2014 (an increase of 2,393%).  It increased its 45 mg dosage from about $0.13 per unit in May 2014 to about $3.86 per unit by September 2014 (an increase of 2,902%).  The effective price of the 60mg dosage increased from about $0.13 per unit in May 2014 to about $3.50 per unit by November 2014 (an increase of 2,670%).  Sandoz's effective prices remain high and have not returned to the pre-conspiracy, competitive level.  For example, in November 2016, the effective price of Sandoz's 30 mg. product was approximately $1.55, representing an 1,195% increase over the price of the same product in May 2014.

　　　　　**3.**　　**Taro:** Before the Class Period, Taro's prices were remarkably stable.  In the five preceding months, the standard deviation for its 15 mg., 30 mg., 45 mg., and 60 mg. dosages of clobetasol propionate cream 0.05% products were no more than 2% of the average prices of its products during the same period.  After this period of relative stability, Taro increased its effective prices, beginning in June 2014.  Between May 2014 and June 2014, for its four dosage formulations, Taro raised its effective prices by 262% to 300%. Taro's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 15 mg dosage from about $0.30 per unit in May 2014 to about $3.99 per unit by May 2015 (an increase of 1,311%).  It increased the effective price of the 30 mg dosage from about

$0.26 per unit in May 2014 to about $4.06 per unit in November 2014 (an increase of 1,553%). The effective price of the 45 mg dosage increased from about $0.25 per unit in May 2014 to about $4.15 per unit by April 2015 (an increase of 1,633%). The effective price of the 60 mg dosage increased from about $0.25 per unit in May 2014 to about $3.72 per unit by March 2015 (an increase of 1,481%). Taro increased its WAC benchmark prices on June 3, 2014, 1,684% to 1,993%. The high prices have continued – the high benchmark prices remain in place and effective prices have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Taro's 30 mg. product was approximately $1.53, representing a 587% increase over the price of the same product in May 2014.

4.      **Fougera:** On July 18, 2014, Fougera raised its WAC benchmark prices for its clobetasol proprionate 0.05% cream products from 419% to 1,268%. These high benchmark prices remain in place and have not returned to the pre-conspiracy levels.[3]

C.      **Clobetasol 0.05% gel (15 mg., 30 mg., 60 mg.).**

1.      **Hi-Tech:** Before the Class Period, Hi-Tech's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg., 30 mg., and 60 mg. dosages of clobetasol propionate gel 0.05% products were between 1 and 9% of the average prices of its products during the same period. After this period of relative stability, Hi-Tech began increasing its effective prices in August 2014. Between May 2014 and August 2014, Hi-Tech raised its effective prices for the 15 mg., 30 mg., and 60 mg. dosages respectively by 805%, 619% and 1,009%. Hi-Tech's effective prices for these dosage formulations continued to skyrocket during the Class Period. It increased the effective price of the 15 mg dosage from about $0.48 in May 2014 to about $5.18 per unit by June 2016 (an increase of 1,074%). It increased its 30 mg

---

[3] Fougera's effective prices are not reported.

dosage from about $0.22 per unit in May 2014 to about $4.10 per unit by May 2016 (an increase of 1,904%). The effective price of the 60 mg dosage increased from about $0.20 per unit in May 2014 to about $2.92 per unit by December 2015 (an increase of 1,494%). Hi-Tech increased its WAC benchmark prices on August 9, 2014 by between 1,387% and 2,008%. The high prices have continued – the high benchmark price remains in place and effective prices have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Hi-Tech's 30 mg. product was approximately $3.20, representing a 1,487% increase over the price of the same product in May 2014.

       **2.**     **Sandoz:** Before the Class Period, Sandoz's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg., 30 mg., and 60 mg. dosages of clobetasol propionate 0.05% gel products were between 3% and 9% of the average prices of its products during the same period. After this period of relative stability, Sandoz increased its effective prices, beginning August 2014. Between May 2014 and August 2014, for its three dosage formulations, Sandoz raised its effective prices by 215% to 426%. Sandoz's effective prices for these dosage formulations continued to skyrocket during the Class Period. It increased the effective price of the 15 mg dosage from about $0.28 in May 2014 to about $5.69 per unit by March 2015 (an increase of 2,050%). It increased its 30 mg dosage from about $0.19 per unit in May 2014 to about $3.64 per unit by October 2015 (an increase of 1,940%). The effective price of the 60 mg dosage increased from about $0.18 per unit in May 2014 to about $4.06 per unit by February 2015 (an increase of 2,268%). Sandoz's effective prices remain high and have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Sandoz's 60 mg. product was approximately $1.81, representing an 1,014% increase over the price of the same product in May 2014.

3.      **Taro:** Before the Class Period, Taro's prices were remarkably stable.  In the five preceding months, the standard deviation for its 15 mg., 30 mg., and 60 mg. dosages of clobetasol propionate 0.05% gel products were no more than 3% of the average prices of its products during the same period.  After this period of relative stability, Taro increased its effective prices, beginning in July 2014.   Between May 2014 and July 2014, for its three dosage formulations, Taro raised its effective prices by 668% to 1,363%. Taro's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 15 mg dosage from about $0.57 per unit in May 2014 to about $5.54 per unit by November 2014 (an increase of 973%).  It increased the effective price of the 30 mg dosage from about $0.38 per unit in May 2014 to about $4.89 per unit in April 2015 (an increase of 1,273%).  The effective price of the 60 mg dosage increased from about $0.28 per unit in May 2014 to about $4.56 per unit by February 2015 (an increase of 1,655%). Taro increased its WAC benchmark prices on June 3, 2014, 1,367% to 1,847%. The high prices have continued – the high benchmark prices remain in place and effective prices have not returned to the pre-conspiracy, competitive level.  For example, in November 2016, the effective price of Taro's 60 mg. product was approximately $2.01, representing a 730% increase over the price of the same product in May 2014.

.      4.      **Perrigo:** Before the Class Period, Perrigo's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg., 30 mg., and 60 mg. dosages of clobetasol propionate gel 0.05% products were no more than 5% of the average prices of its products during the same period.  After this period of relative stability, Perrigo began increasing its effective prices in July 2014 and April 2015.  Between May 2014 and July 2014, Perrigo raised its effective prices for its 15 mg. dosage formulation by 196%.  Between May 2014 and April

2015, Perrigo raised its effective prices for its 30 mg. and 60 mg. dosage formulation by 229% and 380%. Perrigo's effective prices for these dosage formulations continued to skyrocket during the Class Period. It increased the effective price of the 15 mg dosage from about $0.25 in May 2014 to about $1.68 per unit by April 2016 (an increase of 679%). It increased its 30 mg dosage from about $0.36 per unit in May 2014 to about $1.67 per unit by May 2016 (an increase of 460%). The effective price of the 60 mg dosage increased from about $0.25 per unit in May 2014 to about $1.37 per unit by May 2015 (an increase of 538%). Perrigo increased its WAC benchmark prices on January 6, 2016 by between 756% and 1,039%. The high prices have continued – the high benchmark price remains in place and effective prices have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Perrigo's 15 mg. product was approximately $1.39, representing a 562% increase over the price of the same product in May 2014.

5.      **Fougera:** On July 18, 2014, Fougera raised its WAC benchmark prices for its clobetasol proprionate 0.05% gel products from 665% to 922%. These high benchmark prices remain in place and have not returned to the pre-conspiracy levels.[4]

D.      <u>**Clobetasol 0.05% ointment (15 mg., 30 mg., 45 mg., 60 gm).**</u>

1.      **Hi-Tech:** Before the Class Period, Hi-Tech's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg., 30 mg., and 60 mg. dosages of clobetasol propionate ointment 0.05% products were no more than 6% of the average prices of its products during the same period. After this period of relative stability, Hi-Tech began increasing its effective prices in July 2014. Between May 2014 and July 2014, Hi-Tech raised its effective prices for the 15 mg., 30 mg., and 60 mg. dosages respectively by 273%, 637%, 479%,

---

[4] Fougera's effective prices are not reported.

and 760%. Hi-Tech's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 15 mg dosage from about $0.24 in May 2014 to about $4.08 per unit by November 2015 (an increase of 1,667%).  It increased its 30 mg dosage from about $0.15 per unit in May 2014 to about $2.34 per unit by November 2014 (an increase of 1,522%).  The effective price of the 45 mg dosage increased from about $0.21 per unit in May 2014 to about $3.95 per unit by September 2014 (an increase of 1,870%).  The effective price of the 60 mg dosage increased from about $0.20 per unit in May 2014 to about $4.93 per unit by October 2014 (an increase of 2,408%).  Hi-Tech increased its WAC benchmark prices on August 9, 2014, by 2,053% to 2,316%. The high prices have continued – the high benchmark price remains in place and effective prices have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Hi-Tech's 30 mg. product was approximately $1.32, representing a 857% increase over the price of the same product in May 2014.

2.     **Sandoz:** Before the Class Period, Sandoz's prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg., 30 mg., and 60 mg. dosages of clobetasol propionate 0.05% ointment products were between 6% and 16% of the average prices of its products during the same period.  After this period of relative stability, Sandoz increased its effective prices, beginning August 2014.  Between May 2014 and August 2014, for its three dosage formulations, Sandoz raised its effective prices by 508% to 630%. Sandoz's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 15 mg dosage from about $0.12 in May 2014 to about $3.70 per unit by November 2014 (an increase of 3,050%).  It increased its 30 mg dosage from about $0.07 per unit in May 2014 to about $3.10 per unit by November 2014 (an increase of 4,149%).  It increased the

effective price of the 45 mg dosage from about $0.09 in May 2014 to about $2.95 per unit by January 2015 (an increase of 3,162%). The effective price of the 60 mg dosage increased from about $0.08 per unit in May 2014 to about $3.35 per unit by November 2014 (an increase of 4,257%).  Sandoz's effective prices remain high and have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Sandoz's 30 mg. product was approximately $2.01, representing an 2,697% increase over the price of the same product in May 2014.

> **3.**     **Taro:** Before the Class Period, Taro's prices were remarkably stable.  In the five preceding months, the standard deviation for its 15 mg., 30 mg., and 60 mg. dosages of clobetasol propionate 0.05% ointment products were no more than 1% of the average prices of its products during the same period.  After this period of relative stability, Taro increased its effective prices, beginning in July 2014.  Between May 2014 and July 2014, for its four dosage formulations, Taro raised its effective prices by 993% to 1,173%.  Taro's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 15 mg dosage from about $0.31 per unit in May 2014 to about $5.24 per unit by October 2014 (an increase of 1,669%).  It increased the effective price of the 30 mg dosage from about $0.26 per unit in May 2014 to about $4.84 per unit in January 2015 (an increase of 1,859%).  It increased the effective price of the 45 mg dosage from about $0.27 per unit in May 2014 to about $4.49 per unit by February 2015 (an increase of 1,653%). The effective price of the 60 mg dosage increased from about $0.26 per unit in May 2014 to about $4.31 per unit by January 2015 (an increase of 1,662%). Taro increased its WAC benchmark prices on June 3, 2014, 2,063% to 2,135%. The high prices have continued – the high benchmark prices remain in place and effective prices have not returned to the pre-conspiracy, competitive level.  For example, in November 2016, the effective

price of Taro's 15 mg. product was approximately $3.17, representing a 1,010% increase over the price of the same product in May 2014.

        **4.**     **Fougera:** On July 18, 2014, Fougera raised its WAC benchmark prices for its clobetasol proprionate 0.05% ointment products from 1,031% to 1,285%. These high benchmark prices remain in place and have not returned to the pre-conspiracy levels.[5]

      **E.**    **Clobetasol propionate 0.05% topical solution (25 ml., 50 ml.)**

        **1.**     **Hi-Tech:** Before the Class Period, Hi-Tech's prices were remarkably stable. In the five preceding months, the standard deviation for its 25 ml. and 50 ml. dosages of clobetasol propionate 0.05% topical solution products were 15% to 23% of the average prices of its products during the same period. After this period of relative stability, Hi-Tech began increasing its effective prices in July 2014. Between May 2014 and July 2014, Hi-Tech raised its effective prices for 25 ml. and 50 ml. dosages respectively by 365% and 473%. Hi-Tech's effective prices for these dosage formulations continued to skyrocket during the Class Period. It increased the effective price of the 25 ml. dosage from about $0.27 in May 2014 to about $1.98 per unit by October 2015 (an increase of 737%). It increased its 50 ml. dosage from about $0.18 per unit in May 2014 to about $1.52 per unit by July 2016 (an increase of 856%). Hi-Tech increased its WAC benchmark prices on August 9, 2014 by between 588% and 618%. The high prices have continued – the high benchmark price remains in place and effective prices have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Hi-Tech's 50 ml. product was approximately $1.21, representing a 679% increase over the price of the same product in May 2014.

---

[5] Fougera's effective prices are not reported.

2.     **Morton Grove:** Before the Class Period, Morton Grove's prices were remarkably stable.  In the five preceding months, the standard deviation for its 25 ml. and 50 ml. dosages of clobetasol propionate 0.05% topical solution products were no more then 4% of the average prices of its products during the same period.  After this period of relative stability, Morton Grove began increasing its effective prices in September 2014.  Between May 2014 and September 2014, Morton Grove raised its effective prices for 25 ml. and 50 ml. dosages respectively by 446% and 700%.  Morton Grove's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 25 ml. dosage from about $0.16 in May 2014 to about $1.42 per unit by November 2014 (an increase of 875%).  It increased its 50 ml. dosage from about $0.24 per unit in May 2014 to about $2.32 per unit by October 2014 (an increase of 980%).  Morton Grove increased its WAC benchmark prices on September 2, 2014 by 932%-953%.  The high prices have continued – the high benchmark price remains in place and effective prices have not returned to the pre-conspiracy, competitive level.  For example, in November 2016, the effective price of Morton Grove's 25 ml. product was approximately $0.86, representing a 530% increase over the price of the same product in May 2014.

3.     **Taro:** Before the Class Period, Taro's prices were remarkably stable.  In the five preceding months, the standard deviation for its 25 ml. and 50 ml. dosages of clobetasol propionate 0.05% topical solution products were no more then 3% of the average prices of its products over the same period.  After this period of relative stability, Taro began increasing its effective prices in July 2014.  Between May 2014 and July 2014, it raised its effective prices for 25 ml. and 50 ml. dosages respectively by 449% and 549%. Taro's effective prices for these dosage formulations continued to skyrocket during the Class Period.  It increased the effective price of the 25 ml. dosage from about $0.30 in May 2014 to about $2.26 per unit by November 2014 (an

increase of 743%). It increased its 50 ml. dosage from about $0.26 per unit in November 2014 to about $3.18 per unit by March 2015 (an increase of 1,225%). Taro increased its WAC benchmark prices on June 3, 2014 by 562%-587%. The high prices have continued – the high benchmark price remains in place and effective prices have not returned to the pre-conspiracy, competitive level. For example, in November 2016, the effective price of Taro's 50 ml. product was approximately $0.59, representing a 229% increase over the price of the same product in May 2014.

> **4.** **Sandoz:** Before the Class Period, Sandoz's prices were remarkably stable. In the five preceding months, the standard deviation for its 50 ml. dosage of clobetasol propionate 0.05% topical solution products was only 4% of the average prices of its products over the same period. After this period of relative stability, Sandoz began increasing its effective prices in August 2014. Between May 2014 and August 2014, it raised its effective prices by 401%. Sandoz's effective prices continued to skyrocket during the Class Period. It increased the effective price from about $0.14 in May 2014 to about $1.52 per unit by December 2014 (an increase of 1,065%). The high prices have continued and effective prices have not returned to the pre-conspiracy, competitive level. In November 2016, the effective price of Sandoz's 50 ml. product was approximately $0.85, representing a 592% increase over the price of the same product in May 2014.

> **5.** **Fougera**: On July 18, 2014, Fougera raised its WAC benchmark price for its clobetasol proprionate 0.05% topical solution products by 416%. These high benchmark prices remain in place and have not returned to the pre-conspiracy levels.[6]

---

[6] Fougera's effective prices are not reported.

6.      Defendants' price increases were, for the most part, in lockstep. Clobetasol prices remained at supra-competitive levels throughout the Class Period.

7.      Defendants' price increases were against their economic self-interest.  Clobetasol is a commodity product. Therefore, absent a cartel, if any manufacturer increased the price of clobetasol, it would be expected that its competitors would not increase the price but would seek to sell more clobetasol to the first manufacturer's customers. Accordingly, it would not be in any manufacturer's unilateral self-interest to increase the price of the clobetasol it sold unless it had an agreement with the other manufacturers that they would do the same.

8.      In 2014, there was no significant increase in the costs of making clobetasol, there was no significant decrease in supply, and there was no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for clobetasol. Such price increases in a commodity product for which there were no significant increases in costs or demand, or significant decrease in supply, would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

9.      Defendants' dramatic and unexplained price increases have resulted in extensive scrutiny by the United States Congress and federal and state regulators.

10.     Plaintiffs allege that during the Class Period, Defendants combined, conspired and contracted to fix, raise, maintain and stabilize prices at which clobetasol would be sold, and allocate customers, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for clobetasol.

## II.      PARTIES

### a.      Plaintiffs

11.      Plaintiff FWK Holdings, L.L.C. ("FWK") is an Illinois limited liability company located in Glen Ellyn, Illinois. FWK is the assignee of antitrust claims possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising from its purchase of clobetasol during the Class Period directly from one or more of the Defendants at artificially inflated prices.  As a direct and proximate result of Defendants' collusion, manipulative conduct, and unlawful acts, FWK was injured in its business or property.

12.      Plaintiff César Castillo, Inc. ("Cesar Castillo") is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business and headquarters located at Bo. Quebradas Arena, Rd. #1 Km. 26.0, Rio Piedras, Puerto Rico, 00926.  During the Class Period, Cesar Castillo purchased clobetasol directly from one or more Defendants.  As a direct and proximate result of Defendants' collusion, manipulative conduct, and unlawful acts, Cesar Castillo was injured in its business or property.

### b.      Defendants

#### i.      *Sandoz Defendants*

13.      Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a specialty dermatology generic pharmaceutical company that markets and sells generic clobetasol throughout the United States. Fougera is a wholly owned subsidiary of Defendant Sandoz, Inc. During the Class Period, Fougera sold clobetasol products to customers in this District and other locations in the United States.

14.     Defendant Sandoz, Inc. ("Sandoz"), is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a global leader in generic pharmaceuticals and biosimilars, and is a subsidiary of Novartis AG. Sandoz acquired Fougera in July 2012 for $1.5 billion in cash, making Sandoz the top generic dermatology medicines company globally and in the United States. During the Class Period, Sandoz sold clobetasol products to customers in this District and other locations in the United States.

15.     In this Complaint, Fougera and Sandoz will be referred to collectively as "Sandoz."

ii.     **Hi-Tech Defendants**

16.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech Pharmacal") is a Delaware corporation with its principal place of business in Amityville, New York. Hi-Tech Pharmacal markets and sells clobetasol throughout the United States. Hi-Tech Pharmacal acquired five Abbreviated New Drug Applications ("ANDA") for clobetasol propionate .05% (ointment, solution, cream, emoltion cream, and gel) from DFB Pharmaceuticals Inc. in or around 2009. In August of 2013, Akorn, Inc. acquired Hi-Tech Pharmacal for $640 million. During the Class Period, Hi-Tech Pharmacal sold clobetasol products to customers in this District and other locations in the United States.

17.     Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Chicago, Illinois. Akorn acquired Hi-Tech Pharmacal in August 2013, in part to broaden its product line into topical creams and ointments. As a result of its acquisition of Hi-Tech Pharmacal, Akorn, through Hi-Tech, sold clobetasol products to customers in this District and other locations in the United States.

18.     In this Complaint, Hi-Tech Pharmacal and Akorn will be referred to collectively as "Hi-Tech."

18

### iii.    Perrigo

19.    Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with offices at 1700 Bathgate Avenue, Bronx, New York. Perrigo manufactures cream and ointment tubes, producing more than 50 million tubes annually.    During the Class Period, Perrigo, sold clobetasol products to customers in this District and other locations in the United States.

### iv.    Taro

20.    Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro USA is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd. During the Class Period, Taro USA sold clobetasol products to customers in this District and other locations in the United States.

### v.    Wockhardt Defendants

21.    Defendant Wockhardt USA LLC ("Wockhardt"), is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Wockhardt maintains manufacturing plants and substantial operations in the United States, including its wholly-owned subsidiary Morton Grove Pharmaceuticals, Inc., through which it sold clobetasol products to customers in this District and other locations in the United States during the Class Period.

22.    Defendant Morton Grove Pharmaceuticals Inc. ("Morton Grove") is a Delaware corporation headquartered in Morton Grove, Illinois.  Morton Grove is a wholly-owned subsidiary of Wockhardt.  During the Class Period, Morton Grove sold clobetasol products to customers in this District and other locations in the United States.  Morton Grove is registered to do business in New York State.

23.    In this Complaint, Wockhardt and Morton Grove will be referred to collectively as "Wockhardt."

24.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

### A.     Agents and Co-Conspirators

25.     Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this Complaint.

26.     Various other persons, firms, companies, and corporations not named as Defendants knowingly and willingly conspired with Defendants, and performed acts and made statements in furtherance of the conspiracy and the alleged anticompetitive conduct.

27.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## III.    JURISDICTION AND VENUE

28.     Plaintiffs bring this action to (i) recover treble damages, attorneys' fees, litigation expenses, and court costs, and (ii) secure injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15 and 26.

29.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

30.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting interstate trade and commerce, discussed below, has been carried out in this District.

31.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

32.     This Court has personal jurisdiction over each Defendant, because each Defendant has transacted business, including the sale of clobetasol in this District, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the United States and including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.     INTERSTATE TRADE AND COMMERCE

33.     Defendants are the leading manufacturers and suppliers of clobetasol sold in the United States.

34.     Clobetasol products are produced by or on behalf of Defendants or their affiliates in the United States and/or overseas.

35.     During the Class Period, Defendants, directly or through one or more of their affiliates, sold clobetasol throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

36.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

37.     Defendants' and their co-conspirators' conduct, including the marketing and sale of clobetasol, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

38.     The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs and the Class of the benefits of free and open competition in the purchase of clobetasol within the United States.

39.     Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of clobetasol, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing clobetasol prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States and on import trade and commerce with foreign nations.

## V.      FACTUAL ALLEGATIONS

### A.      Overview of the Generic Drug Market

#### 1.      Generic drugs should lead to lower prices

40.     Brand name drugs are typically patented and the patent owner can charge a monopoly price.  After the patent expires, generic drugs enter the market.  Generic drugs typically provide consumers with a lower cost alternative to brand name drugs while providing the same treatment. Specifically:

> A generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use. Before approving a generic drug product, FDA requires many rigorous tests and procedures to assure that the generic drug can be substituted for the brand name drug. The FDA bases evaluations of substitutability, or "therapeutic equivalence," of generic drugs on scientific evaluations. By law, a generic drug product must contain the identical amounts of the same active ingredient(s) as the brand name product. Drug products evaluated as "therapeutically equivalent" can be expected to have equal effect and no difference when substituted for the brand name product.

FDA, Generic Drugs: Questions and Answers, *available at* http://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm.

41.     Further, "[d]rug products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product." *Id.*

42.     Generic versions of brand name drugs are priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical market, generic versions are liberally and substantially substituted for their brand counterparts. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand product unless the doctor has indicated that the prescription for the brand product must be dispensed as written. States adopted substitution laws following the federal government's 1984 enactment of the Hatch-Waxman Act.

43.     Prior to the conspiracy alleged herein, the FDA has recognized that "[g]eneric competition is associated with lower drug prices[.]" A Federal Trade Commission study reached the same conclusion finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices." Economic literature in the healthcare market further confirms that competition by generic products results in lower prices for consumers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price without the impact of competitive market forces. Once the first generic enters the market, however, a brand drug rapidly loses sales, on average 90% within a year. As more generic manufacturers enter the market, prices for generic versions of a drug predictably will continue to decrease because of competition among the generic manufacturers, and the loss

of sales volume by the brand drug to the corresponding generic accelerates as more generic options are available to purchasers.

44.     A mature generic market, such as the market for clobetasol, has several generic competitors. Due to the fact that each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[7] Over time, generics' pricing nears the generic manufacturers' marginal costs.

45.     Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug product can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found that the use of generic medicines saved the United States healthcare system $1.68 trillion between 2005 and 2014.

## 2.     Pricing of Generic Pharmaceuticals

46.     The pricing of prescription pharmaceutical products in the U.S. is governed by institutional features typically not present in the marketplace for other consumer products.

47.     Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay.  Because of the unique features of the prescription drug marketplace, however, pricing of prescription drugs for most consumers is not determined between the retailer and the consumer.   Rather, because most consumers' prescription drug

---

[7] *See, e.g.*, FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); Congressional Budget Office, "How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry" (July 1998).

purchases are reimbursed by public or private health plans, the pricing for prescription drugs is determined by reimbursement agreements between these prescription drug payors, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that dispense drugs to the payors' insured consumers.

48.     At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured consumers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up and/or dispensing fee. Over time, however, it was learned that the list price for most generic drugs published by their manufacturers was substantially higher than the actual cost incurred by pharmacies to acquire the drugs.

49.     To reduce the cost of prescription drugs to the public, prescription drug payors developed Maximum Allowable Cost prices ("MACs") to determine the amount that pharmacies would be reimbursed for dispensing generic pharmaceuticals.  The MAC price refers to the maximum amount that a payor will reimburse a pharmacy for a given strength and dosage of a generic drug or brand name drug that has a generic version available.  A MAC price thus represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.

50.     Payors set the MAC price of a drug based on a variety of factors, including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions.

51.     MAC pricing is designed to incentivize pharmacies to purchase the least costly version of a generic drug available in the market, without regard to the manufacturer's list price. Because the reimbursement amount to a pharmacy is limited by the MAC price for a generic drug and each of its equivalents regardless of the pharmacy's acquisition cost, a pharmacy's profit will

25

be reduced, or lost altogether, if it purchases other than the lowest cost generic product. Alternatively, if a retail pharmacy purchases the lowest priced generic version of the drug, it will maximize its profit.

52.     MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices.  Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug while competing manufacturers do not will swiftly lose sales to a competing generic manufacturer whose price remains constant.

53.     Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales.

### B.     The DOJ and 20 States' Attorneys General Are Investigating How Generic Drug Companies Utilized Trade Associations to Reach Illegal Agreements

54.     The DOJ is reportedly looking closely at trade associations. According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by someone with knowledge of the government's generic pricing investigation, the DOJ is looking closely "at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

55.     Similarly, an investigation by several states' attorneys general of the generic drug industry has focused on trade associations and other meetings among generic drug manufacturers.

56.     Defendants operate through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors.  Generic drug manufacturers exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and

sow the seeds for their illegal agreements. The anticompetitive agreements are further refined and coordinated at regular "industry dinners", "girls nights out", lunches, parties, and numerous and frequent telephone calls, emails and text messages.

57.     At these various conferences and trade shows, representatives from Defendants have opportunities to interact with each other and discuss their respective businesses and customers. Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting. Generic drug manufacturer representatives who attend these functions use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

58.     In short, these trade shows and customer conferences provide generic drug manufacturers with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### 1. Generic Pharmaceutical Association

59.     GPhA is the "leading trade association for generic drug manufacturers and distributors, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." GPhA was formed in 2000 from the merger of three industry trade associations: GPhA, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

60.     According to GPhA's website, "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." GPhA states that, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment. In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."

61.     Representatives from each of the Defendants attended GPhA events during the Class Period.

62.     Several of Defendants' high-ranking corporate officers served on GPhA's Board of Directors before and during the Class Period:

    a.   2012 Board of Directors: Don DeGolyer, President and CEO, Sandoz, Inc.; David Klaum, Senior Vice President & General Manager, Fougera;

    b.   2013 Board of Directors: Don DeGolyer, President and CEO, Sandoz, Inc.; Doug Boothe, Executive Vice President and General Manager, Perrigo Pharmaceuticals;

    c.   2014 Board of Directors: Doug Boothe, then-Executive Vice President and General Manager, Perrigo Pharmaceuticals; Peter Goldschmidt, President Sandoz, US & Head, North America Sandoz;

    d.   2015 Board of Directors: Doug Boothe, Executive Vice President and General Manager, Perrigo Pharmaceuticals; Peter Goldschmidt, President Sandoz, U.S. Head, North America;

    e.   2016 Board of Directors: Richard Stec, Perrigo Company; Peter Goldschmidt, President Sandoz, US & Head, North America.

### 2. National Association of Chain Drug Stores

63.     The mission of NACDS is to advance the interests and objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as a provider of healthcare services and consumer products.

64.     Representatives from each of the Defendants attended NACDS events during the Class Period.

### 3. Defendants Opportunities for Collusion

65.     On February 19-21, 2014, GPHA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Defendants.

66.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

> a.  **Defendant Perrigo**: Doug Boothe, President Generics Division; Tony Polman, National Account Executive; John Wesolowski, Acting General Manager;
>
> b.  **Defendant Sandoz**: Peter Goldschmidt, President Sandoz, US & Head, North America; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales & Marketing;
>
> c.  **Defendant Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada;

d. **Defendant Wockhardt**: Michael Craney, President of Sales & Marketing.

67.    On June 3-4, 2014, GPHA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Defendants.

68.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by the following representatives from Defendants:

a. **Defendant Hi-Tech:** Ed Berrios, VP, Sales and Marketing - Hi-Tech Pharmacal Co., Inc.; Michael Corley, VP, National Accounts; Thomas Kronovich, VP, National Accounts; Bruce Kutinsky, Chief Operating Officer; Mick McCanna, Executive Director of National Accounts; Raj Rai Chief, Executive Officer; John Sabat, Senior Vice President of National Accounts; M. Tranter, National Accounts Manager, Sales & Marketing;

b. **Defendant Perrigo**: Doug Boothe, President Generics Division; H. James, Booydegraaff Associate Director, Marketing; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President & General Manager; Kristine Norman, Account Executive; Tony Polman, National Account Executive; John Wesolowski, Acting General Manager;

c. **Defendant Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National

Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers;

d. **Defendant Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing & Business Development, US and Canada; Christopher Urbanski, Director, Corporate Accounts;

e. **Defendant Wockhardt**: Karen Andrus, Director of Sales; Michael Craney, President of Sales & Marketing; Sunil Khera, President-The Americas, Japan & Emerging Markets; Scott Koenig, Vice President Sales and Marketing, Generics; Joe Niemi, Manager, National Accounts; Bob Watson, Vice President, National Accounts.

69.     Defendants continued to attend trade association meetings and conference throughout 2015 and 2016, including: i) NACDS's 2015 annual meeting at The Breakers, Palm Beach, Florida on April 25-28, 2015; ii) NACDS's 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado on August 22-25, 2015; iii) GPhA's meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland on November 2-4, 2015; iv) NACDS's annual foundation dinner in New York City on December 3, 2015; v) NACDS's 2016 annual meeting at The Breakers, Palm Beach, Florida on April 16-19, 2016; and vi) NACDS's 2016 Total Store Expo at the San Diego Convention Center in San Diego, California on August 19-22, 2016.

70.     In addition to these frequent conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  A large number of generic drug manufacturers, including several of the Defendants, have offices in close proximity

to one another in New Jersey or New York, giving them easier and more frequent opportunities to meet and collude.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."

71.     As a result of these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

72.     Defendants routinely communicate and share information with each other about bids and pricing strategy. This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

73.     Defendants also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates. Generic drug manufacturers use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

**C.     Clobetasol Prices Soar**

74.     As alleged above in Paragraphs 65-68, Defendants met at least three times in 2014 prior to implementing their price increases.

75.     These meetings, among other contacts among Defendants, provided Defendants with opportunities to collude, and at these meetings Defendants agreed to increase pricing for

clobetasol.  Soon after the June 2014 GPhA meeting, Defendants caused the prices for clobetasol to increase by extraordinary amounts, as alleged above in Paragraph 5.

76.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. No supply disruption was reported by Defendants with respect to clobetasol during the Class Period.

77.     In a report dated April 21, 2015, Richard Evans, Scott Hinds and Ryan Baum at Sector & Sovereign Research concluded that: "A plausible explanation is that generic manufacturers . . . **are cooperating to raise the prices of products whose characteristics** (low sales due to either very low prices or very low volumes) accommodate price inflation." (Emphasis added).

78.     The abrupt shift in the pricing of clobetasol has had a devastating impact on customers.

79.     For example, on August 5, 2015, Norman Levine, M.D., a private practitioner in Tucson, AZ wrote in *Dermatology Times*, an online news magazine:

> A patient with a minimally steroid-responsive dermatosis, vitiligo, recently contacted me to complain that he could no longer afford the medication that I had prescribed for him.  I was puzzled when he informed me that a 60-gram tube of clobetasol cream would now cost him $220, an amount that was far beyond his budget.   The medication was no longer on his insurance plan's formulary, presumably because it had become too expensive for them as well. At first I was highly doubtful and assumed that the dispensing pharmacy had mistakenly substituted a name-brand product for the generic version I had prescribed.  A quick survey of several local pharmacies confirmed that all were pricing clobetasol above $200.

80.     Defendants' adherence to their price-fixing scheme generated considerable profits. For example, before the price increase in June, Taro's clobetasol averaged $3 million in weekly gross sales. After the price increase, Taro's weekly gross sales of clobetasol increased to $20 million, while its market share remained relatively stable during this period.

81.     In its Q2 2014 earnings call with industry analysts on November 10, 2014, Kal Sundaram, Taro's CEO stated: "Net sales for Q2 were $251 million, up 22% over Q2 last year. As we anticipated in last quarter's earnings release we are realizing the benefits of the previous quarter's price adjustments in the current quarter. Gross profit increased 24% to $198 million year-on-year resulting in a 130 basis points expansion in our gross margins to 79%."

82.     On September 14, 2016, the Economics Times of India reported that "While Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases."

83.     In its annual report for the period ended December 31, 2015, Akorn reported: "Our gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014. Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014." The company attributed the increased profit margin to the effects of "price changes."

84.     In or about May 2016, Akorn told industry analysts that "63% of [its] growth in 1Q16 versus 1Q15 was driven by price."

85.     In its Q2 2016 earnings call with industry analysts on August 4, 2016, Akorn's CFO, Duane Portwood, stated: "net revenue for the quarter ended June 30, 2016, was $281 million, an increase of $60 million or 27% over the prior-year quarter. The increase in revenue was driven by organic growth, with approximately two-thirds attributable to price."

86.     Similarly, Perrigo reported that gross profit grew by $59 million from 2014 to 2015, primarily due in part to "pricing initiatives" taken in the first quarter of fiscal year 2015 (July-September 2014).

**D.    Congressional, State Attorneys General, and Regulators' Responses to Rising Generic Drug Prices**

87.    Defendants' dramatic and unexplained price increases have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators.

88.    On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Congressman Elijah Cummings sent letters to several generic drug manufacturers, including Sun Pharmaceutical Industries, Inc., which controls Taro, asking for detailed information on their generic drug price increases.

89.    On November 20, 2014, Senator Sanders's committee held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" Various witnesses discussed the price increases for generic drugs. No chief executive of a generic drug manufacturer testified.

90.    In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation into generic drug manufacturers' marketing and pricing practices, and has caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with the investigation.

91.    According to a June 26, 2015 report by the service Policy and Regulatory Report ("PaRR Report") (available at http://www.mergermarket.com/pdf/DoJCollusion-Generic-Drug-Prices-2015.pdf):

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

92.    Several Defendants have confirmed receipt of grand jury subpoenas.

93.    On September 9, 2016, Taro disclosed in an SEC filing that "Taro Pharmaceuticals, U.S.A., Inc. . . . . as well as two senior officers in its commercial team, received grand jury subpoenas

from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."

94.     According to a *Bloomberg News* article, Sandoz has confirmed that, it received a subpoena from the DOJ in March 2016, and stated that it believed the subpoena was related to "the industry-wide investigation into generic drug pricing in the U.S."[8]

95.     On December 14, 2016, the DOJ unsealed criminal Informations against two former senior executives of generic drug manufacturer Heritage Pharmaceuticals Inc. for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs (Glyburide and Doxycycline Hyclate DR).  The criminal actions are styled *U.S. v. Glazer* (16cr506) and *U.S. v. Malek* (16cr508), and are pending in the U.S. District Court for the Eastern District of Pennsylvania.

96.     Malek and Glazer have now entered plea agreements admitting that between April 2013 through December 2015, each engaged in a conspiracy to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate, and a similar conspiracy between April 2014 and December 2015 concerning glyburide. Their plea agreements provide for cooperation in any federal investigation involving violations of criminal and antitrust law concerning "the production and sale of generic pharmaceuticals in the United States."  In exchange, the government promised immunity from criminal prosecution regarding doxycycline hyclate, glyburide, or any generic pharmaceutical product enumerated on a list filed under seal.

---

[8]     https://www.bloomberg.com/news/articles/2016-11-17/nypd-union-goes-after-drug-prices-amid-doj-pharma-investigation.

97.     Reportedly, the DOJ is preparing additional cases involving other generic drugs.

98.     In addition, on December 15, 2016, several states' attorneys general, including the New York Attorney General, filed a civil action for violations of the Sherman Act against sellers of the generic drugs Glyburide and Doxycycline Hyclate DR.  The action filed by the attorneys general is styled *The State of Connecticut, et al., v. Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Mylan Pharmaceuticals USA, Inc. and Teva Pharmaceuticals USA, Inc., Heritage Pharmaceuticals, Inc., and Mylan Pharmaceuticals, Inc.*, and is pending in U.S. District Court in Connecticut (16-cv-2056) (the "State AG Action").

99.     According to the State AG Action, generic drug manufactures, like Defendants, operate through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors.  Generic drug manufacturers exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements. The anticompetitive agreements are further refined and coordinated at regular "industry dinners", "girls nights out", lunches, parties, and numerous and frequent telephone calls, emails and text messages.

100.    According to the State AG Action, the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the U.S.  Although the State AG Action focuses on Glyburide and Doxycycline Hyclate DR, it alleges that the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors.

101.    Connecticut State Attorney General George Jepsen stated the following about the

AG Action:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States," said Attorney General Jepsen. "While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry.  Ultimately, it was consumers – and, indeed, our healthcare system as a whole – who paid for these actions through artificially high prices for generic drugs. We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market."[9]

102.    New York Attorney General Eric T. Schneiderman stated the following about the

AG Action:

> Lawsuit Alleges Widespread Conspiracy Among Competitors To Reduce Competition, Increase Prices For Generic Prescription Drugs . . .

> The investigation, which is still ongoing as to a number of additional generic drugs, uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States.[10]

## VI.    THE CLOBETASOL MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

103.    Because Defendants' anticompetitive conduct constitutes a conspiracy to fix prices

that is a *per se* violation of Section 1 of the Sherman Antitrust Act, Plaintiffs do not need to define

a relevant market for purposes of proving liability.  However, there are features of the market

relevant to this case that show both (i) that these markets are susceptible to collusion and (ii) that

the price increases and customer allocations were in fact the result of collusion and not the result

of conscious parallelism.

---

[9]    http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341 (December 15, 2016 Press Release).

[10]    https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage (December 15, 2016 press release).

104.   **High Degree of Industry Concentration**: A concentrated market is more susceptible to collusion and other anticompetitive practices. The clobetasol market had a small number of competitors controlling a significant market share at the time prices began to increase, as follows: i) **clobetasol cream**:  Taro (55%); Hi-Tech (32%); Sandoz (12%); ii) **clobetasol emollient:** Taro (34%); Hi-Tech (11%); Sandoz (54%); iii) **clobetasol ointment:** Taro (53%); Hi-Tech (18%); Sandoz (29%); iv) **clobetasol gel:** Taro (22%); Hi-Tech (15%); Sandoz (33%); Perrigo (30%); and v) **clobetasol solution:** Taro (17%); Hi-Tech (35%); Sandoz (16%); Wockhardt (31%).

105.   The clobetasol market is highly concentrated and is dominated by a handful of companies. Therefore, elaborate communications, quick to be detected, would not have been necessary to enable pricing to be coordinated.

106.   **Sufficient Numbers to Drive Competition.**  While the clobetasol market had a small enough number of competitors to foster collusion, the number of makers was large enough that – given decades of experience with competitive generic pricing, and accepted models of how generic companies vigorously compete on price – one would have expected prices to remain at their historical, near direct cost levels.  From 2014 through 2016 there were at least 3, and at times as many as 4, significant makers of clobetasol products in the market, but prices remained above pre-conspiracy prices.

107.   With numbers of generic competitors such as this, historical fact and accepted economics teaches that – absent collusion – prices would remain at competitive marginal cost levels.

108.   **High Barriers to Entry**: The clobetasol market presents significant barriers to entry.  Significant investments of time and money are required to develop, test and manufacture

these products.  The time and money required preparing applications for, and gaining, FDA approval is significant; approval times in and of themselves impede the ability of any non-participant to the market to challenge short run increases in price.  Barriers to entry increase the market's susceptibility to a coordinated effort among the dominant entities in the generic pharmaceutical industry to maintain supracompetitive prices.

109.    As the dominant players in the clobetasol market, Defendants were able to fix, raise, and maintain their prices, and allocate market share for clobetasol without competitive threats from rival generic drug manufacturers.

110.    **Lack of Substitutes**: Many patients are unable to substitute other medications for clobetasol.  In some cases, clobetasol is the only effective treatment for certain skin conditions.

111.    **Demand Inelasticity**: "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

112.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

113.    Clobetasol is a necessary treatment for millions of patients for which no substitutes are available. Clobetasol is thus particularly susceptible to collusive price fixing as price increases

will not result in such a loss of sales as to reduce profits, but instead will result in more profits for cartel members.

114.    **High Degree of Interchangeability**: Clobetasol is a commodity product. Therefore, Defendants' products are interchangeable, as they contain the same chemical compounds made from the same raw materials and are therapeutically equivalent.   This characteristic facilitates collusion because cartel members can more easily monitor and detect deviations from a price-fixing agreement.  In addition, because these are commodity products, all Defendants had to raise or maintain prices for the cartel to work.  Indeed, it was against a Defendant's individual economic interest, absent a cartel, to raise prices since the other Defendants could have priced below that Defendant's price and taken substantial market share.

115.    **Opportunities for Contact and Communication Among Competitors**: Defendants are members of trade associations, like GPhA and NACDS, which provide opportunities to conspire.  Before and during the Class Period, Defendants' representatives regularly attended trade association conferences and meetings, including the February and the June 2014 GPhA meetings, and the April 2014 NACDS meeting. Indeed, the DOJ and 20 state attorney general are analyzing trade associations like GPhA and NACDS as a potential avenue for facilitating collusion between different generic drug manufacturers as part of their respective investigations into anticompetitive pricing and customer allocation agreements.

116.    **Absence of Departures from the Markets:** There were no departures from the market that could explain the price increases, and therefore, departures from the market cannot explain the defendants' supra-competitive prices.

117.    **Absence of Competitive Sellers**: Defendants have increased prices despite the entry of at least one major supplier to the market.  Further, Defendants have maintained

supracompetitive pricing for clobetasol throughout the Class Period. Thus, Defendants collectively have sufficient market power in the clobetasol market to enable them to increase and maintain prices without significantly losing market share.

118.    **Size of the Price Increases**.  The magnitude of the price increases alleged above in Paragraph 5 differentiates them from mere parallel price increases.  Oligopolists seeking to test price increases, where there is no significant change in supply or demand indicators, usually need to take measured approaches.  But here the increases are not 5% or even 10% jumps – the increases are, in just one act, often double, triple or more the current price of the product.  A rational oligopolist, when unaided with the certainty that its ostensible competitors would follow, would not make such huge price increases.

119.    **Reimbursement of Generic Drugs.**  These markets, as with many generic drug markets, have institutional features that would inhibit non-collusive parallel price increases.  The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions.  As a result, the usual inhibitions of an oligopolist to unilaterally raise price are embedded in the generic reimbursement system.  In the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales.  However, when one observes significant generic price increases – particularly those of the kind alleged here – basic market economics dictates that the generic drug makers likely had an expectation that they would not lose volume (based on their expectations of what their ostensible competitors would do) – because they colluded.

## VII.   THE DEFENDANTS ACTED AGAINST THEIR UNILATERAL SELF-INTEREST ABSENT A CARTEL

120.    Clobetasol is a commodity product. Therefore, absent a cartel, if any manufacturer increased the price of clobetasol, it would be expected that its competitors would not increase the price but would seek to sell more clobetasol to the first manufacturer's customers. Accordingly, it would not be in any manufacturer's unilateral self-interest to increase the price of the clobetasol it sold unless it had an agreement with the other manufacturers that they would do the same.

121.    During the Class Period, there was no significant increase in the costs of making clobetasol and no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for clobetasol. Such price increases in a commodity product for which there were no significant increases in costs or demand would not have been in each Defendant's unilateral self-interest absent the existence of a cartel. As alleged above, there were no reported shortages.

## VIII.   CLASS ACTION ALLEGATIONS

122.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiffs brings this action on behalf of a Class defined as follows:

> All persons who or entities which purchased clobetasol directly from Defendants in the United States and its territories and possessions at any time during the Class Period (June 2014 to the present). Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

123.    Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe the Class Members are numerous and widely dispersed throughout the United States. Further, the Class is readily identifiable from information and records maintained by Defendants.

124.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiff's interests are not antagonistic to the claims of the other Class Members, and there are no material

conflicts with any other member of the Class that would make class certification inappropriate. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.

125.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

126.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law in the pharmaceutical industry.

127.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class, thereby determining damages with respect to the Class as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

128.    The common legal and factual questions, which do not vary from Class Member to Class Member and which may be determined without reference to individual circumstances of any Class Member, include, but are not limited to, the following:

> (a) Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby artificially increase the prices of clobetasol in the United States;

> (b) The duration and extent of the alleged contract, combination, or conspiracy;

> (c) Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

> (d) The effect of the contract, combination, or conspiracy on the prices of clobetasol in the United States during the Class Period;

(e) Whether Defendants' conduct caused supracompetitive prices for clobetasol;

(f) Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

(g) Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

129.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

130.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.    ANTITRUST INJURY

131.     During the Class Period, Plaintiffs and Class Members directly purchased clobetasol from Defendants. As a result of the Defendants' anticompetitive conduct, Plaintiffs and Class Members paid more for clobetasol than they would have and thus suffered substantial overcharges. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

132.     Because Defendants' unlawful conduct has successfully eliminated competition, Plaintiff and Class Members have sustained, and continue to sustain, significant overcharges in

the form of artificially inflated prices paid to Defendants. The full amount of such overcharges will be calculated after discovery and upon proof at trial.

133.    Defendants' misconduct reduced competition in the sale of clobetasol, reduced choice for purchasers, and caused injury to purchasers.

134.    Defendants' anticompetitive conduct is ongoing, and as a result Plaintiff and the Class continue to pay supracompetitive prices for clobetasol.

## X.    VIOLATION OF THE SHERMAN ACT § 1

135.    Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

136.    Defendants' anticompetitive acts were intentional, were directed at the sales of clobetasol in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing clobetasol prices throughout the United States.

137.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

a. Prices charged to, and paid by, Plaintiff for clobetasol were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b. Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the sale of clobetasol in the United States market; and

c. Competition in establishing the prices paid for clobetasol was unlawfully restrained, suppressed, or eliminated.

138.    Defendants' and their co-conspirators' anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.

46

139.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for clobetasol.

140.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were damaged in their business or property by paying prices for clobetasol that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable overcharges to be established at trial.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs and Class Members respectfully demand the relief as set forth below:

A.     Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representative and its counsel of record as Class Counsel;

B.     That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     Permanent injunctive relief that enjoins Defendants from violating the antitrust laws and requires them to take affirmative steps to dissipate the effects of the violations;

D.     A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

E.     By awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

F.     The costs of this suit, including reasonable attorney fees; and

Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated: February 10, 2017                         Respectfully submitted,

                                                 KAPLAN FOX & KILSHEIMER LLP

                                        By:      /s/ *Robert N. Kaplan*
                                                 Robert N. Kaplan
                                                 Richard J. Kilsheimer
                                                 Jeffrey P. Campisi
                                                 Joshua Saltzman
                                                 850 Third Avenue, 14th Floor
                                                 New York, New York 10022
                                                 Tel: 212-687-1980
                                                 Fax: 212-687-7714
                                                 Email: rkaplan@kaplanfox.com
                                                     rkilsheimer@kaplanfox.com
                                                     jcampisi@kaplanfox.com
                                                     jsaltzman@kaplanfox.com


                                                 Thomas M. Sobol
                                                 David S. Nalven, DN-2374
                                                 Lauren Guth Barnes
                                                 Kiersten Taylor
                                                 Hagens Berman Sobol Shapiro LLP
                                                 55 Cambridge Parkway, Suite 301
                                                 Cambridge, Massachusetts 02142
                                                 Tel: 617-482-3700
                                                 Fax: 617-482-3003
                                                 Email:  tom@hbsslaw.com
                                                     davidn@hbsslaw.com
                                                     lauren@hbsslaw.com
                                                     kiersten@hbsslaw.com

                                                 -and-

                                                 VANEK, VICKERS & MASINI P.C.
                                                 Joseph M. Vanek
                                                 David P. Germaine

55 W. Monroe, Suite 3500
Chicago, Illinois 60603
Tel: 312-224-1500
Fax: 312-224-1510
Email: jvanek@vaneklaw.comv
        dgermaine@vaneklaw.com

*Attorneys for Plaintiff FWK Holdings, L.L.C.*

NUSSBAUM LAW GROUP, PC.
Linda P. Nussbaum
Bart D. Cohen (PA Bar No. 57606)
Bradley J. Demuth
Peter E. Moran
1211 Avenue of the Americas
40th Floor
New York, New York 10036-8718
Tel: 917-438-9189
Fax: 917-438-9198
Email:  lnussbaum@nussbaumpc.com
        bcohen@nussbaumpc.com
        bdemuth@nussbaumpc.com
        pmoran@nussbaumpc.com


-and-

JUAN R. RIVERA FONT LLC
Juan R. Rivera Font
Ave. González Giust #27, Suite 602
Guaynabo, PR 00968
Tel: 787-751-5290
Email: juan@riverfont.com

*Attorneys for Plaintiff César Castillo, Inc.*